**UNITED STATES of America, Appellee,**

. v.

**Rory Tyree McELROY, Appellant.**

**No. 238, Docket 82–1086.**

United States Court of Appeals, Second Circuit.

Argued Oct. 1, 1982.

Decided Dec. 27, 1982.

Peter Lushing, New York City, for appellant.

Stephen Schlessinger, Asst. U.S. Atty., New York City (John S. Martin, Jr., U.S. Atty. for the S.D.N.Y., Roanne L. Mann, Asst. U.S. Atty., New York City, of counsel), for appellee.

Before LUMBARD, OAKES and WINTER, Circuit Judges.

LUMBARD, Circuit Judge:

The record on this appeal by Rory Tyree McElroy from his convictions under 21 U.S.C. § 846 (1976) for conspiracy to possess and distribute heroin and under 21 U.S.C. § 841(a)(1) (1976) for distribution and possession of heroin with intent to distribute convinces us that by failing timely to advise defense counsel of McElroy's responses to the *Miranda* warnings the prosecutor prejudiced McElroy's defense and deprived him of a fair trial. We reverse the judgment and remand for further proceedings.

I.

McElroy was convicted in a jury trial held before Judge Metzner of the Southern District of New York between January 5th and 7th, 1982. Only three witnesses testified at McElroy's trial: undercover Agent Wilbur Ladson of the Drug Enforcement Administration (DEA), Ruby Mitchell (McElroy's confederate who pleaded guilty

before trial), and DEA Agent Alvah Henley, who helped arrest McElroy on October 1, 1981 and heard McElroy's post-arrest statement. All testified for the government.

Agent Ladson testified that an informant introduced him to Ruby Mitchell on July 30, 1981 at Mitchell's apartment in Brooklyn. Ladson asked Mitchell if she could supply him with an ounce of heroin. Mitchell agreed to make inquiries and told Ladson to contact her later. Six days later, on August 5th, Mitchell met Ladson outside "The Hole," a bar at 33rd Street and Eighth Avenue. Mitchell entered Ladson's car where Ladson exhibited $7,000 cash purchase money. She then went into a nearby building and returned with an ounce of heroin. Ladson paid Mitchell the $7,000 for the heroin plus a $500 tip.

In late September, Ladson again contacted Mitchell and asked to purchase three ounces of heroin. On October 1st Ladson met Mitchell at "The Hole" and drove her to a bar at 164th Street and Amsterdam Avenue. During the trip Ladson showed Mitchell $24,000 in purchase money. When Ladson and Mitchell arrived at the bar Mitchell entered while Ladson waited in his car. After some delay, and several trips between Ladson's car and the bar, Mitchell brought McElroy out of the bar and into the car. McElroy took a rear seat in the car and Mitchell took the front passenger seat. Mitchell then gave Ladson a brown paper bag containing three ounces of heroin. McElroy simultaneously removed an empty paper bag from his jacket and opened it in order to collect the purchase money. Ladson, however, signaled Agent Henley and other agents who moved in and arrested Mitchell and McElroy.

Ruby Mitchell's testimony confirmed Ladson's account and added several details implicating McElroy. She said that McElroy had been hidden in her apartment when Ladson visited her on July 30th, and that she had paid him $300 to serve as her lookout during the August 5th delivery. Mitchell testified that a man named "Sweat" had supplied the ounce of heroin that she transferred on August 5th. When Ladson contacted Mitchell in late September to purchase three ounces, "Sweat" told Mitchell that he would not supply her with such a large amount of heroin. He did, however, put Mitchell in touch with an unidentified person who agreed to supply the drug. Acting at that person's direction, Mitchell, on October 1st, told Ladson to drive to the bar at 164th Street. Mitchell met McElroy inside the bar and McElroy gave her a brown bag containing the heroin. McElroy told her that after the delivery they were to take the money to a certain address. She and McElroy then entered Ladson's car.

Following Mitchell's direct testimony, the prosecutor told defense counsel that there were no written reports of post-arrest statements by Mitchell. On cross-examination, however, Mitchell claimed that she gave DEA agents a post-arrest statement that was consistent with her testimony. Therefore, after Mitchell left the stand, counsel asked the prosecutor to again check whether he had a written record of Mitchell's post-arrest statement, and if not, to stipulate that Mitchell did not make the post-arrest statement as she claimed. The prosecutor responded to this request by again denying the existence of any written reports. However, upon prodding by Judge Metzner the prosecutor agreed to check into the matter. He thereafter revealed to defense counsel Paragraph Five of a report prepared by DEA Agent Vincent Velotta. Paragraph Five summarized a post-arrest statement that Mitchell had made to Velotta. In showing this paragraph to counsel, the prosecutor folded the report so as to hide a paragraph which summarized a post-arrest statement made by McElroy. The prosecutor told Judge Metzner that his failure earlier to reveal Velotta's report was "an oversight ... for which I have full responsibility." Because Paragraph Five was consistent with Mitchell's testimony, and revealed nothing new about the October 1st transaction, counsel chose not to re-open his cross-examination of Mitchell.

The next witness was Agent Henley. Henley testified that after arresting McEl-

roy the agents placed him in Henley's car and advised him of his rights. Henley then drove McElroy to the DEA office in Manhattan.

Upon arriving at the DEA office, Agent Henley filled out a personal history form with information provided by McElroy. While awaiting the use of the fingerprinting and photographing facilities, Agent Henley told McElroy that he would soon be taken to the Metropolitan Correctional Center (MCC), and that the next morning, a magistrate would set bail in his case. He then remarked that McElroy was not the prime target of the investigation, that DEA was seeking to prosecute more significant offenders than he, and that when McElroy spoke with his attorney, he should convey to him that DEA would welcome his cooperation.

At that point McElroy stated that he wished to explain what had happened. Agent Henley then re-advised McElroy of his rights; McElroy, however, decided to speak. He told Agent Henley that he had been asked by Mitchell earlier in the day to meet her at the bar on Amsterdam Avenue, and that he had agreed to do so out of personal concern for Mitchell's safety. McElroy at first stated that he had only a vague notion that Mitchell was involved in illicit activities, but soon acknowledged that he knew she was transacting a narcotics sale although he was not the source of those narcotics. No written statement was taken nor did Henley make contemporaneous notes of McElroy's admission. The exchange took approximately fifteen minutes, after which McElroy was processed and transported to the MCC.

Before trial, McElroy's counsel had requested discovery of McElroy's statements under Fed.R.Crim.P. 16(a). In response to that request, the prosecutor on December 1 and 23, 1981, had sent counsel letters summarizing McElroy's post-arrest admissions. However, the prosecutor had told counsel in those letters and orally that McElroy's statements had been "volunteered" and had not been recorded in any written report. Therefore, on cross-examination, defense counsel inquired into Henley's failure to make a written report of the admissions and his lack of knowledge as to whether any other agent had made such a report. Counsel by his questions sought to imply that the government's failure to record a piece of evidence as important as the defendant's own admissions might mean that the admissions were never made. Counsel asked the government to stipulate that none of the DEA agents' reports mentioned the alleged admissions. The prosecutor then approached the bench and showed Judge Metzner Paragraph Six of Agent Velotta's report, which had been made out on October 5, 1981, four days after McElroy's arrest. Paragraph Six states:

It should be noted that at the time McELROY was advised of his Constitutional Rights, he advised Special Agents Henley and Roberto that he did not want to talk to the agents. However, at the New York District Office, McELROY advised that he would talk to the agents. Special Agent Henley then reminded McELROY of his Constitutional Rights. McELROY advised that he understood his rights and was still willing to talk to the agents. McELROY denied that he was the source of supply for the heroin. He admitted that he knew that MITCHELL was delivering heroin to Special Agent Ladson, but claimed that he was only with her for her "protection."

Velotta prepared this report after Henley told him about his conversation with McElroy. Velotta himself did not hear most of McElroy's post-arrest statement and Henley apparently did not know of Velotta's report. The prosecutor suggested that under the circumstances, the government could not stipulate as requested. Complaining that he had been "sandbagged" by the prosecutor's failure timely to disclose the report of McElroy's statements, counsel moved for a mistrial. Judge Metzner directed a lunch recess, and after the jury retired, the colloquy continued:

THE COURT: Did you turn the report over to the defense concerning this witness?

MR. SCHLESSINGER: Your Honor, I first showed it to him at sidebar.

THE COURT: Just now?

MR. SCHLESSINGER: Just now.

MR. COHEN: I still have not seen the report. You showed it to the Judge.

MR. SCHLESSINGER: I am sorry. I will show it to you.

THE COURT: This is the second time you have forgotten to turn over written reports in your trial.

MR. COHEN: Your Honor, can the witness be excused?

THE COURT: It doesn't matter.

This is the second time you have done it.

MR. SCHLESSINGER: I am sorry, your Honor. It was an oversight. I can only say—

THE COURT: This goes to the guts of this man's testimony. Without that, his testimony is useless here.

MR. COHEN: I am sorry, your Honor. I happen to like Mr. Schlessinger personally, but it is not an oversight. We have had numerous conversations about the failure of Drug Enforcement Administration to record these darn things and time and time again I have said, is it written anywhere. He said no.

I just cannot believe that it is an oversight. It goes to an essential fact in this case, and I was sandbagged.

We just had a discussion in which apparently this same form was shown me purposely folded by Mr. Schlessinger so as not to reveal whatever else is on there.

THE COURT: Was that the same page?

MR. COHEN: Apparently it is. Ask him, your Honor. I didn't look at anything except the paragraph I was directed to.

MR. SCHLESSINGER: It is the same page, your Honor . . .

.    .    .    .    .

THE COURT: When did you find out this piece that you showed me up here at sidebar? When Mr. Cohen asked you for a stipulation there was no such report, you obviously knew there was such a report.

MR. SCHLESSINGER: Your Honor, it jogged my recollection at that point.

Judge Metzner denied counsel's motion for a mistrial or suppression hearing. The trial, following further discussion, proceeded.

Since the prosecutor's letters had not mentioned McElroy's invocation of his rights, revelation of Paragraph Six informed counsel for the first time that McElroy had refused to answer questions when he was placed in Henley's car. Therefore, when cross-examination of Henley was resumed, counsel inquired further into McElroy's response to the *Miranda* warnings. This examination revealed that McElroy, in addition to refusing to answer questions, had told the agents in the car that he wanted a lawyer, and that Henley, prior to taking McElroy's statement at the DEA office, had reminded McElroy of his earlier request to see a lawyer and had advised him not to speak without an attorney.

Following McElroy's conviction his counsel made a post-trial motion for a new trial or, in the alternative, for a suppression hearing. Counsel argued that had he been earlier informed of McElroy's invocation of his rights he would have moved to suppress McElroy's admissions. On February 16, 1982, Judge Metzner denied the post-trial motion. Judge Metzner called the prosecutor's conduct "incomprehensible" and wrote that it was "virtually impossible to have prepared this case for trial and interviewed the DEA agents without learning of the existence of the report." However, the Judge reasoned that a government failure to disclose information under Fed.R.Crim.P. 16(a) or under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), justifies a new trial only if the government misconduct prejudiced the defendant. He concluded that the delayed disclosure of the Velotta report did not prejudice McElroy because the only new information contained in the report—the fact that McElroy had invoked his right to remain silent—was fully within McElroy's knowledge. He similarly ruled that counsel's failure to make a timely suppression motion was not excused

because the information counsel needed to support the motion—McElroy's invocation of his rights—was available to counsel through his client regardless of the government's nondisclosure.

On March 2, 1982 Judge Metzner sentenced McElroy on the conspiracy count to a prison term of one year and one day, and on the possession count to a five-year term of probation to commence upon the expiration of his confinement. McElroy is currently free on bail, pending this appeal.

## II.

McElroy raises three principal claims. First, through his appointed appellate counsel, he argues that he did not receive the effective assistance of counsel at trial. Second, he argues that Fed.R.Crim.P. 16(a), the Jencks Act (18 U.S.C. § 3500 (1976)), and *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), obligated the government to disclose Paragraph Six of Velotta's report. Finally, he argues that Rule 16(a), without regard to the existence of Velotta's report, required the government to disclose the substance of his responses to the *Miranda* warnings. We conclude that McElroy's latter argument correctly interprets Rule 16(a). Because we also conclude that the government's failure to disclose prejudiced McElroy's defense and deprived him of a fair trial, we reverse McElroy's convictions.

In relevant part, Rule 16(a)(1)(A) provides:

> Upon request of a defendant the government shall permit the defendant to inspect and copy or photograph: ... the substance of any oral statement which the government intends to offer in evidence at the trial made by the defendant whether before or after arrest in response to interrogation by any person then known to the defendant to be a government agent.

McElroy's post-arrest admission to Agent Henley that he knew he was participating in a drug sale obviously was discoverable as an oral statement intended for use by the government at trial. The prosecutor properly disclosed the substance of that admission in the letters sent defense counsel on December 1 and 23, 1981. However, the prosecutor never informed defense counsel that McElroy had invoked his *Miranda* rights prior to his conversation with Henley at DEA headquarters. Instead, using a potentially misleading characterization, the prosecutor in the letter of December 23rd wrote that McElroy had "volunteered" his admission. We believe that the prosecutor should have revealed to defense counsel McElroy's invocation of his rights, and indeed, that Rule 16(a)(1)(A) required him to do so. Our conclusion follows from our interpretation of the policies behind Rule 16.

Rule 16's provision for the discovery of oral statements is intended, in part, to "facilitate the raising of objections to admissibility prior to trial." Advisory Committee Notes to the 1974 Proposed Amendments to Rule 16. Pretrial resolution of admissibility issues obviously contributes to the efficient administration of justice. Judicial efficiency, however, is not the only concern underlying the 1975 amendment[1] of Rule 16 to permit pretrial discovery of oral statements. In addition, the amendment reflects the drafters' studied conclusion that pretrial discovery of oral statements serves significantly to protect the defendant's right to a fair trial. Pretrial discovery prevents the defendant from being unfairly surprised with his statements at trial and enhances the ability of defense counsel to suppress inadmissible statements. In particular, statements obtained in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) are most likely to be identified and suppressed if they are made available to counsel prior to trial. In short, Rule 16 discovery is an important guarantor of simple fairness to defendants. *See* Advisory Committee Notes, *supra.* ("(B)road discovery contributes to the fair and efficient administration of criminal justice by providing the defendant with enough infor-

1. The amendments proposed in 1974 took ef-    fect, in relevant part, on December 1, 1975.

mation to make an informed decision as to plea; by minimizing the undesirable effect of surprise at the trial; and by otherwise contributing to an accurate determination of the issue of guilt or innocence.").

We believe that Rule 16(a)(1)(A) requires the government to disclose the substance not only of the incriminating post-arrest oral statements which it intends to use at trial, but also the substance of the defendant's responses to any *Miranda* warnings which preceded the statements. Disclosure, to be meaningful, must be made of the defendant's responses both to the warnings which immediately preceded his admissions and to any other set(s) of warnings given the defendant from arrest onwards. Requiring the government to make such disclosure will bring to light *Miranda* violations that might otherwise remain hidden because the defendant misunderstands his rights, fails fully to inform defense counsel, or is unable to remember. Disclosure is clearly consistent with the view that pretrial discovery is an important avenue to the protection of defendants' rights. As prudence and long practice require law enforcement officers to record a defendant's responses to the *Miranda* warnings,[2] disclosure imposes no significant additional burden on law enforcement agencies. We believe that our interpretation of Rule 16 will, at little cost to effective law enforcement, help to make meaningful in practice the important rights which motivated the *Miranda* decision. Although we are aware of no decision directly supporting our reading of Rule 16's "oral statements" provision,[3] neither do we know of any decision directly opposed.

The government, however, contends that the position we now adopt is inconsistent with the language of Rule 16. Stressing that Rule 16 requires disclosure only of oral statements "which the government intends to offer in evidence at ... trial," the government argues that a defendant's response to the *Miranda* warnings is not discoverable because an invocation of rights cannot, under *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), constitute any part of the government's evidence at trial. We believe that the government's argument interprets Rule 16 with a degree of literalism inappropriate to the Rule's purpose. In limiting the defendant's right of discovery to oral statements intended for use at trial, Rule 16 merely relieves the government from the unnecessary burden of disclosing statements that are irrelevant to the defendant's trial preparation or defense. Rule 16 thus does not cover oral statements unrelated to the crime charged or completely separate from the government's trial evidence. *See, e.g., United States v. Zarattini,* 552 F.2d 753, 757 (7th Cir.), *cert. denied,* 431 U.S. 942, 97 S.Ct. 2661, 53 L.Ed.2d 262 (1977). How very different is a defendant's invocation of *Miranda* rights in a case where the government seeks to use a defendant's oral statements or admissions in its case-in-chief. Far from being unrelated to the government's proof, or unnecessary to the defendant's defense, an invocation of rights in such a case frequently will determine the admissibility of a crucial portion of the government's evidence. The defendant's response to the *Miranda* warnings is, in fact, so closely related to the admission

**2.** This Circuit previously has held that a government agent's written summary of a defendant's oral statements is discoverable, in the court's discretion, as a "written statement" under Rule 16. *United States v. Johnson,* 525 F.2d 999, 1003–04 (2d Cir.1975), *cert. denied,* 424 U.S. 920, 96 S.Ct. 1127, 47 L.Ed.2d 327 (1976). *See also United States v. Lewis,* 511 F.2d 798 (D.C.Cir.1975).

**3.** In *United States v. Manetta,* 551 F.2d 1352, 1356 (5th Cir.1977), the Fifth Circuit held that Rule 16 required the government to disclose the defendant's statement that he did not wish to

talk and would talk to his lawyer. The prosecutor in *Manetta* used the defendant's invocation of his rights to prove the defendant's sanity after the defendant presented evidence of insanity. The Fifth Circuit concluded that under the circumstances the defendant's invocation of rights, in and of itself, constituted on oral statement used by the government at trial and as such was discoverable under Rule 16. The court did not consider the discoverability of a defendant's response to the *Miranda* warnings where the response is not itself to be used as evidence.

itself and, at least potentially, so necessary to the defendant's defense, as to be inseparable from the admission. We therefore conclude that, for purposes of Rule 16, the statement which the government seeks to use on direct, and the defendant's response to preceding set(s) of *Miranda* warnings, comprise but a single "statement."

Applying our reading of Rule 16(a) to the present case, we conclude that the prosecutor did not make the disclosure to which McElroy was entitled. In response to counsel's request for Rule 16 discovery, the prosecutor should have disclosed the substance of McElroy's admission *and* his earlier invocation of *Miranda* rights. Had such disclosure been made, counsel would have received, prior to trial, clear notice of possible grounds for a suppression motion. Because of the prosecutor's failure to disclose, counsel did not become aware of McElroy's invocation of rights until the cross-examination of Henley. At that point in the proceedings it was too late properly to make a motion to suppress. *See* Fed.R.Crim.P. 12(b)(3). Although we do not decide the admissibility of McElroy's admission, the record indicates that a motion to suppress would not have been frivolous. *Cf. Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

■ We must next consider the effect of the nondisclosure on the fairness of McElroy's trial. In the absence of substantial prejudice to the defendant, government nondisclosure under Rule 16(a)(1)(A) ordinarily does not constitute grounds for reversal. Courts frequently have ruled that nondisclosure is not prejudicial if the statements withheld by the government are equally within the defendant's own knowledge. *See, e.g., United States v. Gleason,* 616 F.2d 2, 25 (2d Cir.1979), *cert. denied,* 444 U.S. 1082, 100 S.Ct. 1037, 62 L.Ed.2d 767 (1980); *United States v. Smith,* 557 F.2d 1206, 1210–11 (5th Cir.1977), *cert. denied,* 434 U.S. 1073, 98 S.Ct. 1259, 55 L.Ed.2d 777 (1978). Proper disclosure in this case would have revealed to defense counsel that McElroy had invoked his rights to remain silent and to an attorney. McElroy, however, obviously had knowledge of the response he gave to the *Miranda* warnings, and he could have communicated that response to his counsel. The government therefore argues that its nondisclosure did not prejudice McElroy. We cannot accept the government's argument.

As an initial matter, the availability of particular statements through the defendant himself does not negate the government's duty to disclose statements subject to Rule 16. Defense counsel is entitled to plan his trial strategy on the basis of full disclosure by the government regardless of the defendant's knowledge or memory of the disclosed statements. The effect of nondisclosure in the present case was aggravated by the prosecutor's gratuitous statement to counsel that McElroy's admission was "volunteered." That statement was offered not as a theory of admissibility, but as an assertion of fact. As such, the statement could have misled counsel into believing that grounds for a suppression motion did not exist.

More important, the government's failure to disclose prejudiced McElroy because it kept from his counsel's eyes possible grounds for a suppression motion. We reject as unrealistic the government's argument that appellate relief must be denied because counsel could have obtained from McElroy the information necessary to make the motion. The defendant in a criminal case often mistrusts his counsel who, in most instances, has been assigned and not chosen, or believes that his counsel will best defend him if he is kept ignorant of the facts. Even a defendant who cooperates with his counsel cannot always remember all of the relevant facts, or realize the importance to his defense of seemingly inconsequential police actions. Defense lawyers, as a result, often learn much more about what has happened from government discovery, formal and informal, than they do from their clients. This fact surely is one of the reasons behind the adoption of Rule 16 and other rules which have greatly broadened discovery in criminal cases. Considerations of this kind carry especial

weight in the present case. McElroy, at the time of his arrest, was only 18 years old. Even a delinquent who may be too wise for his years in the ways of crime certainly is not educated in the ways of the criminal justice system. Although McElroy might reasonably be expected to tell his attorney something about the offense with which he was charged, he could not be expected to know which facts were relevant to his best defense. We do not hold that a failure to disclose a defendant's invocation of rights necessarily is prejudicial. Under the circumstances of this case, however, we conclude that the government's failure to make proper Rule 16 disclosure did prejudice McElroy and deprive him of a fair trial. McElroy's convictions therefore must be reversed. Ruling as we do, we need not reach McElroy's other claims of error.

Reversed and remanded.