**UNITED STATES of America,**

v.

**Raymond JIMENEZ, Defendant.**

**No. 84 Cr. 947(RWS).**

United States District Court,
S.D. New York.

Aug. 23, 1985.

Rudolph W. Giuliani, U.S. Atty. for the S.D. of N.Y., New York City by Mary T. Shannon, Asst. U.S. Atty., New York City, for U.S. of America.

Donald D. Buchwald, New York City, for defendant.

## OPINION

SWEET, District Judge.

On May 9, 1985, following a four-day trial, a jury returned a guilty verdict on each of two counts against Raymond Jimenez ("Jimenez"). He was found guilty of violating 21 U.S.C. §§ 812, 841, and 846. Jimenez has now moved to set aside the verdict and to suppress certain evidence at any retrial, alleging 1) that the government failed to comply with its obligations under Fed.R.Crim.P. 12(d)(2) to disclose to the defense prior to trial statements made by Jimenez to Detective Dennis Casey ("Casey") at the time of Jimenez's arrest on November 20, 1984; 2) that the introduction into evidence of post-arrest statement by Jimenez to Casey, in response to questions posed prior to *Miranda* warnings in the absence of a public emergency or exigent circumstances violated Jimenez's Fifth and Sixth Amendment rights; and 3) the admission of certain "similar fact" evidence was improper. The motions are denied.

**Facts**

Jimenez was arrested on November 20, 1984 at 175th Street and Audubon Avenue. After being handcuffed but before being given his *Miranda* warnings, Jimenez was asked by the arresting officers "where he had come from." Jimenez responded that he had just been at an apartment at 532 West 175th Street, and based on Jimenez' answer, the officer, with Jimenez, proceeded to the apartment. There the officers made further arrests and seized $6,595.00 in cash which Curtis Ross, the apartment's occupant, stated belonged to Jimenez. Jimenez was given his *Miranda* warnings while at the apartment and thereafter acknowledged that the cash was his.

During the informal discovery that preceded trial, Assistant United States Attorney Stephen Markstein ("Markstein") advised Don Buchwald, counsel for Jimenez ("Defense Counsel"), that Jimenez had made no post-arrest statements. In a letter of December 21, 1984 to Markstein, Defense Counsel wrote:

> You have advised me that no statements of any kind were obtained by the government from my client ... to the best of your knowledge. You agreed to promptly advise me otherwise if you learn to the contrary.

Defense Counsel also subsequently requested, pursuant to Fed.R.Crim.P. 12(d)(2), all evidence the government intended to use at trial that was discoverable pursuant to Rule 16. In a letter dated January 4, 1985, Markstein wrote to Defense Counsel that:

> Since I last spoke to you concerning the case, I have been informed that defendant Jimenez, following his arrest and being advised of his rights, admitted that the $6,959 confiscated from a brief case at 532 West 175th Street, see 2(d) above, belonged to him.

No disclosure of any other post-arrest statements was made.

No allegation has been made that the failure to disclose Jimenez' statements was

intentional or more than inadvertance. Assistant United States Attorney Charles La Bella, who tried the case, submitted an affidavit in response to this motion stating:

In preparation for trial I thoroughly reviewed the case file, including all DEA reports and GX 35021, Agent Mark Moger's Surveillance Report, which constituted the primary report of the activities leading up to the arrest of Raymond Jimenez and the post-arrest activities.

In preparation for trial I also interviewed Agent Mark Moger and Agent Dennis Casey. I have no recollection of being told of Casey's question nor Jimenez' answer before trial. It was my understanding during pretrial preparation that one of the many surveillance agents outside of 532 West 175th Street had observed the defendant come from the Ross apartment.

In the morning of the second day of trial, Casey, an investigator with the New York Drug Enforcement Task Force, testified on direct examination as follows:

A. Okay. When I returned to that location we were still conducting surveillance on this auto which was double parked on 175th Street just over Audubon Avenue. The car I am referring to is the Oldsmobile, and at approximately 7:30 p.m., a gentleman sitting over there with the white shirt on and a young lady headed towards that auto.

Q. Was that the defendant who headed towards the car?

A. That's correct.

Q. Was that the same car you had followed earlier into New Jersey and back again to New York?

A. Yes, it is.

Q. When they approached the car, what did you do?

A. At that time I identified myself, I grabbed Mr. Jimenez, placed him under arrest, I rear cuffed him. The other officer assisted me, took custody of the young lady that was there. We asked him where they came from and then we went to an apartment on 175th Street.

Q. Did he tell you where he had come from?

A. Yes, he did.

Q. Did you go back to that location?

A. Yes, we did.

Q. What happened when you got there?

A. Okay. I had Mr. Jimenez in custody at that time. We knocked on the door, identified ourselves as police officers, and I believe it was Mr. Ross who let us in, it is a basement apartment on 175th Street.

Q. Was that the same person you had seen earlier accompany the defendant to New Jersey?

A. That is correct.

Q. What happened when you got to the door?

A. Okay. Once we got into the apartment, at that time I gave Mr. Jimenez his rights, and I also gave him a search while the other officers were conducting, taking anybody into custody who might have been there and getting everybody to stay where they were in the apartment.

On cross-examination Casey testified:

Q. And you said, stop, you are under arrest or what did you do?

A. I told him, police. Don't move.

Q. And he didn't move?·

A. No, he didn't. I didn't give him a chance to.

Q. And Gloria Toledo didn't move?

A. No, she didn't.

Q. And you said where are you coming from or where are you going?

A. Not at that time, I didn't.

Q. What did you say?

A. After I placed him under arrest, identified myself, I then asked him where he had come from.

Q. Now did you know where he had come from?

A. I knew approximately, but I wasn't sure. What exact apartment. I know from the location where he came from.

Q. You knew from the building, or the direction or what?

A. Yes, that's correct, across the street from, I guess you would say that would be the south side of 175th Street, his car was on the north side double parked on 175th Street facing east.

When he crossed the street, that is when we approached him.

Q. So you knew the general direction that he was coming from?

A. That's correct.

Q. And it is correct, is it not, that you did not know the actual building that he was coming from?

A. I wasn't sure.

Q. And you didn't know the apartment he was coming from?

A. No, I didn't.

Q. And, to your knowledge, no officers, agents, city police, federal, whatever, the whole group, none of them knew the building and the apartment he was coming from. They knew the general direction, isn't that correct?

A. That's correct.

Q. And he then told you where he had come from?

A. Yes, he did.

Q. And you proceeded back with him to that place?

A. Yes, I did.

Q. He was led away in handcuffs?

A. He was cuffed.

Q. Now, of course, he didn't have to tell you where he was coming from, right? He could have remained silent?

A. He probably could have, yes.

Q. You had given him his warnings, had you not?

A. Not until we got into the apartment.

Q. I see. In other words, you asked him, where are you coming from? And he told you, and then it was later that you gave him his warning?

A. I gave him his rights in the apartment. I wanted to get him off the street.

Defense Counsel did not object to the admission of the statements that violated Jimenez' rights following either Casey's direct testimony or his cross-examination, nor did he object to the admission of statements that had not been turned over during discovery or to the admission of evidence—the $6,595.00 in cash, or Jimenez' admission of ownership of the money—that were apparently the fruit of the illegal interrogation.

Upon argument of this motion, it was argued that in view of the known surveillance, Defense Counsel assumed that the government had an independent basis for establishing the link between Jimenez and the apartment. The government called three witnesses subsequent to Casey, none of whom testified to any link between Jimenez and the apartment in which the cash was found. At the close of the government's case, on the third day of trial, Defense Counsel moved for a mistrial alleging the government's failure to comply with discovery rules 12 and 16 and the introduction of evidence obtained in violation of Jimenez' constitutional rights.

**Discussion**

The government concedes that Casey's pre-*Miranda* questions to Jimenez were *per se* violations. The government also concedes that the failure to disclose Jimenez' statements constitutes a violation of the discovery rules. The government argues, however, that by failing to object until the close of the government's case, although Defense Counsel knew of the violation as soon as Casey testified, the right to object has been waived.

█ An objection or motion to strike is untimely if not " 'made as soon as the ground of it is known, or reasonably should have been known to the objector.' " 21 *C. Wright and K. Graham, Federal Practice and Procedure: Evidence* § 5037, *quoted in U.S. v. Cheek*, 582 F.2d 668, 676 (2d Cir.1978). While the objection cannot be waived if the facts upon which it is based are unknown, the objection must be made as soon as those facts are revealed. *See DiPaola v. Riddle*, 581 F.2d 1111, 1113 (4th Cir.1978), *cert. denied*, 440 U.S. 908, 99 S.Ct. 1215, 59 L.Ed.2d 455 (1979). In *United States v. Kanousby*, 618 F.2d 229 (2d

Cir.1980), the Court found an objection to be untimely after a witness had already been excused. *Id.* at 231. And in *United States v. Frank*, 520 F.2d 1287 (2d Cir. 1975), *cert. denied*, 423 U.S. 1087, 96 S.Ct. 878, 47 L.Ed.2d 97 (1976), the Court found an objection raised in a post-trial Rule 29 motion to be untimely. *Id.* at 1291.

At least two purposes are served by requiring a contemporaneous objection. First, a prompt objection preserves the opportunity for curative instructions or the opportunity to adduce admissible evidence to establish the desired point. The Honorable Paul R. Hays, writing in *United States v. Indiviglio*, 352 F.2d 276 (2d Cir.1965) (en banc), *cert. denied*, 383 U.S. 907, 86 S.Ct. 887, 15 L.Ed.2d 663 (1966), explained:

> The reason for requiring that a specific objection be made is, of course, to give the judge an opportunity to correct the error and thus to avoid the necessity of further proceedings, possibly including a new trial. In the present case, for example, a proper objection might have resulted in the striking out of the evidence objected to and an admonition to the jury to disregard it. It seems entirely possible that the Government could have secured a conviction without the challenged evidence. Or, as an alternative, the judge might have conducted a voir dire into the circumstances surrounding Indiviglio's statement.

*Id.* at 280. *See also United States v. Mangers*, 575 F.2d 32, 44 (2d Cir.1978), *cert. denied*, 439 U.S. 931, 99 S.Ct. 320, 58 L.Ed.2d 324 (1979).

■ Second, requiring a contemporaneous objection denies an attorney the opportunity to use an objection for tactical purposes, awaiting the outcome of events or the disclosure of additional information before challenging the propriety of evidence. While an objection cannot be waived before the facts upon which the objection is based are known, an objection may be waived where an attorney attempts to use the elicited information for tactical advantage and only subsequently objects to its admission.

*See United States v. Katz*, 601 F.2d 66, 67 (2d Cir.1979).

The government argues that Defense Counsel should have known of the pre-*Miranda* questions when Agent Mark Moger testified that his knowledge that Jimenez had come from 532 West 175th Street was not based on personal observation. The government asserts that this information, considered in conjunction with the assumed interview of Jimenez in preparation of an affidavit for a prior motion to suppress, should have provided a foundation for an objection. The presumption that information of the pre-*Miranda* question flowed from Jimenez to Defense Counsel is inappropriate:

> The defendant in a criminal case often mistrusts his counsel who, in most instances, has been assigned and not chosen, or believes that his counsel will best defend him if he is kept ignorant of the facts. Even a defendant who cooperates with his counsel cannot always remember all of the relevant facts, or realize the importance to his defense of seemingly inconsequential police actions. Defense lawyers, as a result, often learn much more about what has happened from government discovery, formal and informal, than they do from their clients.

*United States v. McElroy*, 697 F.2d 459, 465 (2d Cir.1982). Defense Counsel cannot be held accountable for information that may have been elicited from Jimenez, in the absence of proof that such information actually was transferred.

■ Upon Casey's direct examination, however, Defense Counsel was squarely informed of both the failure to produce Jimenez' statement in violation of the discovery rules and the unconstitutionality of the question posed by Casey. Counsel can properly be required to have objected on either ground at the time to the introduction into evidence of the statement. The cross-examination of Casey, *supra*, demonstrates knowledge of both the failure to disclose and the impropriety of Jimenez' post-arrest interrogation. Having knowledge of the grounds upon which an objec-

tion to the evidence could have been made, counsel delayed raising an objection until the close of the government's case, over a full day and three witnesses later, constitutes waiver.

The waiver is a consequence not only of the delay itself, but also of the tactical choice made by Defense Counsel to seek advantage by delaying. At oral argument on this motion Defense Counsel stated:

> Let us suppose that another agent had seen Mr. Jimenez leaving the apartment, so that this was largely academic whether he told them or not, that they knew about it, then I would have done—I would have wanted to do that which I did here, show the voluntary—you know, it is in evidence, the fact that the money is there, is in evidence. I would have wanted to show sort of lack of consciousness of guilt, if those were the facts, if there was no way of being able to keep out the subsequent information that developed in the apartment.

Aware that a basis for objecting to the interrogation of Jimenez existed, counsel chose to retain the option of using the improper evidence to his own advantage, thereby countering evidence which he feared might not be a fruit of the improper question because of the existence of an independent foundation. However, Casey's answer on cross-examination that no officers or agents knew which apartment Jimenez was coming from establish the apartment search as a fruit of the question, and counsel can properly be charged with this knowledge. Having sufficient information to challenge the evidence introduced by the government, counsel chose to retain the option of using Jimenez' voluntary response as evidence of lack of consciousness of guilt, an option he would have sacrificed by keeping the statement out of evidence. Defense Counsel cannot simultaneously preserve this option and the ability to object to the improper evidence. The objection must be deemed waived by his choice not to object until the close of the government's case, at which time he knew he would not call Jimenez as a witness in order to use his voluntary answer as evidence of lack of consciousness of guilt.

The introduction of similar act evidence was proper for the reasons stated at trial. *See United States v. Figueroa,* 618 F.2d 934 (2d Cir.1980); *United States v. Manaf-zadeh,* 592 F.2d 81 (2d Cir.1979).

**Conclusion**

Jimenez' motions for a new trial are denied. Jimenez will be sentenced on September 11, 1985.

IT IS SO ORDERED.