**UNITED STATES of America, Plaintiff-Appellee,**

**v.**

**Raymond JIMENEZ, Defendant-Appellant.**

**No. 639, Docket 85–1360.**

United States Court of Appeals, Second Circuit.

Argued Jan. 15, 1986.

Decided April 30, 1986.

Rudolph W. Giuliani, U.S. Atty. S.D.N.Y. (Charles G. LaBella, Warren Neil Eggleston, Stuart E. Abrams, Asst. U.S. Attys., New York City, of counsel), for plaintiff-appellee.

Donald D. Buchwald, Buchwald & Kaufman, New York City, for defendant-appellant.

Before CARDAMONE and PRATT, Circuit Judges and WYZANSKI, Senior District Judge *.

WYZANSKI, Senior District Judge:

Defendant Raymond Jimenez appeals from a judgment of conviction on two counts: (1) conspiracy to distribute three kilograms of cocaine, in violation of 21 U.S.C. § 846, and (2) distribution of and possession of, with intent to distribute, cocaine, in violation of 21 U.S.C. §§ 812, 841(a)(1) and 841(b)(1)(B). He makes four arguments for reversal: (1) the evidence of the March 1, 1985 seizures was improperly admitted as similar act evidence; (2) because the informant was a vital participant in the crime charged, it was error to refuse to order his production; (3) defendant's "motion to strike the Ross apartment evidence as the fruit of the defendant's involuntary post-arrest *Miranda*-less statement—a statement not disclosed to the defense pre-trial in violation of Rules 12(d)(2) and 16—should have been granted; defense counsel's delay in objecting and moving to strike the Ross apartment evidence because of his erroneous belief ... that there was an independent basis for the admissibility of that evidence, was not a waiver"; and (4) the defendant had a reasonable expectation of privacy in order to challenge the seizure at the Ross apartment.

The arguments require merely an abbreviated statement of the dominant facts.

The critical negotiations for the sale of cocaine on which the conviction of Jimenez was bottomed all occurred on November 20, 1984.

At apartment 2A at 568 West 173rd Street, New York City Detective Jose Guzman and Investigator Raymond Gonzalez and an anonymous Confidential Informant, all with the intent of buying three kilograms of cocaine, met, by previous agreement, Jose Vargas and his wife or girlfriend.

Vargas left the apartment to get a sample of the cocaine for Detective Guzman. During Vargas' absence, Guzman left the apartment. Outside, he, by telephone, gave information about the cocaine negotiations to the headquarters of the Drug Enforcement Administration. Then Guzman returned to the apartment; left once more; and on a second return found Jose Vargas, who had also returned, his brother, Hector Vargas, Eugene Pichardo, and the defendant-appellant Jimenez, but not the cocaine sample.

Next, Jimenez and Pichardo left the apartment together. They returned within minutes. Pichardo handed Guzman a sample of cocaine. Jimenez and Jose Vargas directed Guzman to the rear of the apartment so that they could test the sample. Jimenez told Guzman that he wanted to be sure Guzman was satisfied with the sample before he got the whole 3 kilograms.

In the presence of Jimenez, Guzman, using customary apparatus, tested the sample.

Guzman asked Jimenez to reduce, from the theretofore agreed rate of $41,000 per kilogram, the price for the three to-be-delivered kilograms of cocaine. Jimenez declined and said that before travelling to New Jersey to get the three kilograms he wanted to be sure that the deal was firm. Guzman replied that it was firm.

Jimenez drove his Oldsmobile to the corner of 173rd Street. There he met and talked with Pichardo. Jimenez then drove to the vicinity of 532 West 175th Street,

* The Honorable Charles Edward Wyzanski, Jr. of the United States District Court for the District of Massachusetts, sitting by designation.

where he picked up as a passenger Curtis Ross, whose identity was not then known to the government. Together they drove to Avenel, New Jersey where for 10 minutes they were in an apartment. Then they returned to New York.

At 5:30 p.m. Detective Guzman, Investigator Gonzalez, and the Confidential Informant, for the ostensible purpose of purchasing the cocaine, returned to and, by Jose Vargas, were admitted within, the apartment at West 173rd Street, where the earlier meeting had occurred. In the apartment were Hector Vargas, armed with a pistol which was cocked, and Pichardo.

The Vargas brothers and Pichardo demanded that Guzman bring into the apartment the purchase money. Guzman persuaded Jose Vargas to go outside to Guzman's car to see that Guzman really had the money immediately available. But, despite the exhibition of the money in the car, there was an impasse. Guzman terminated the negotiations; he and his fellows left the area.

An hour later, federal agents observed Jimenez's car parked in the vicinity of 532 West 175th Street. Jimenez and a woman approached the vehicle. The agents placed Jimenez under arrest. The agents did not know whence Jimenez had come. Without giving *Miranda* warnings, Detective Casey asked Jimenez from where he had come. Jimenez answered 532 West 175th Street. (*Hereafter this will be denominated "Jimenez's Miranda-less statement."*)

Casey took Jimenez to an apartment at 532 West 175th Street. He and other federal agents, identifying themselves, knocked at the door. The door was opened by the man who earlier that day had been the companion of Jimenez during the trip to and from New Jersey. For the first time the government then learned that that man's name was Curtis Ross. The agents arrested him, and then gave to both him and Jimenez *Miranda* warnings.

Ross consented to a search of the apartment. The agents seized cash—$6,595 of which Jimenez admitted belonged to him, though he was only an unemployed stu-

dent. The agents also seized a small quantity of cocaine wrapped in a $50 bill.

After the Government at the trial of Jimenez had offered evidence of the foregoing, it rested. But the Court permitted the Government to reopen the evidence to offer what it regarded as "subsequent similar act evidence." The evidence thus offered and admitted was to the effect that on March 1, 1985, Jimenez, while released on bail pending trial of this case, had his house searched, pursuant to a warrant, by New York City Police officers conducting a separate narcotics investigation. That state search led to a seizure of a sawed-off shotgun with shells, lactose, a metal spoon with residue, plastic baggies, two pocket scales, a cocaine dispenser, and a floor safe in which there was over $10,000 in cash.

■ We first address the defendant's argument that his failure promptly to object to, or to move to strike, the admission of the exhibits procured by the search of the West 175th Street apartment to which the agents were led by the defendant's *Miranda*-less statement was an excusable delay because defense counsel supposed until virtually the end of the trial that the agents were led to that place as a result of their own personal observations.

That excuse is contradicted by plain, specific evidence. To be sure, in a pre-trial statement Agent Moger had falsely (though we do not have adequate ground for saying "deliberately") misled the defendant's counsel by Moger's indication that he personally had observed Jimenez coming from the West 175th Street apartment to the Oldsmobile. However, as the first witness at plenary trial, Moger under cross-examination admitted that he had made no such personal observation. Yet, as defendant's counsel argues, such admission left open the speculative possibility that Jimenez's travel route could have been observed by some other government agent who had informed Moger. Nonetheless, that possibility was exploded when Agent Casey under cross-examination, in unambiguous words testified that Jimenez's

route had not been observed by any government representative, but was known to the government only through defendant's *Miranda*-less statement. We quote the relevant testimony:

"Q: And it is correct, is it not, that you did not know the actual building that he was coming from?

A: I wasn't sure.

Q: And you didn't know the apartment he was coming from?

A: No, I didn't.

Q: And, to your knowledge, no officers, agents, city police, federal, whatever, the whole group, none of them knew the building and the apartment he was coming from. They knew the general direction, isn't that correct?

A: That's correct.

Q: And he then told you where he had come from?

A: Yes, he did.

Q: And you proceeded back with him to that place?

A: Yes, I did.

Q: He was led away in handcuffs?

A: He was cuffed.

Q: Now, of course, he didn't have to tell you where he was coming from, right? He could have remained silent?

A: He probably could have, yes.

Q: You had given him his warnings, had you not?

A: Not until we got into the apartment.

Q: I see. In other words, you asked him, where are you coming from? And he told you, and then it was later that you gave him his warning?

A: I gave him his rights in the apartment. I wanted to get him off the street."

Once the cat was out of the bag, there was no excuse for defendant's counsel not promptly moving to strike the objectionable exhibits, if indeed as a matter of trial tactics he then wanted them struck. This was all set forth in the excellent opinion of District Judge Sweet. *United States v. Jimenez*, 618 F.Supp. 799 (S.D.N.Y.1985).

The judge's finding of waiver by the defendant of any objection to the exhibits was by no stretch of the imagination an error by the district judge; his citation of supporting authority is succinct and unanswerable. It would be a work of supererogation to repeat his reasoning and his citations.

■ Next, we address the alleged error of the district court in holding that Jimenez had no standing to challenge the seizure at the Ross apartment on the alleged ground of it having been in violation of the Fourth Amendment to the Constitution. The evidence upon which standing is claimed does not show that Jimenez could reasonably have had any expectation of privacy in either the Ross apartment, or the articles seized therein. Upon the basis of the evidence before it, the district court found that "Jimenez, at most, had occasional access to an apartment, upon his specific request of the owner for the key. Jimenez had to relinquish the key upon termination of his use, and he claims to have had no control over the access of others to the apartment, even when he had the key...." There was no error in either the district court's finding, or in its conclusion of law that Jimenez was without standing to object on Fourth Amendment grounds to the seizure.

■ The next argument we consider is the alleged error of the trial court in not granting the defendant's request to order the government to disclose the name of its Confidential Informant or, in the alternative, to produce the informant for an interview. To show error on this issue, the defendant has the heavy burden of showing that disclosure is "essential to the defense." *Scher v. United States*, 305 U.S. 251, 254, 59 S.Ct. 174, 176, 83 L.Ed. 151 (1938); *United States v. Russotti*, 746 F.2d 945, 949–950 (2d Cir.1984). We have not discerned anything which supports the defendant's claim that the Confidential Informant, whom defendant's counsel sought at least to interview, would have been of even marginal value to the defendant's case. It is obvious to us that the district court did not err as here claimed.

Finally, we address the question, much discussed in the briefs, as to whether the district court abused its discretion in admitting what is commonly referred to as "the similar act evidence." The permissive limits governing such evidence when offered in this circuit are now well settled. Illustrations are to be found in *United States v. Martino*, 759 F.2d 998 (2d Cir.1985), *United States v. Figueroa*, 618 F.2d 934 (2d Cir.1980) and *United States v. Manafzadeh*, 592 F.2d 81 (2d Cir.1979).

We need not deal in detail with the defendant's argument that here the district court clearly abused its discretion in admitting the similar act evidence. A sufficient refutation is furnished by Judge Sweet's own written opinion. We need not gild the lily: obviously he did carefully consider governing authorities and precedents, he did realize that in the present situation the evidence of the so-called similar act was not a duplication of a pattern of conduct revealing, as it is sometimes said, "the signature" of the defendant, but related here to a course of dealing with narcotics at the same general period of time, in the same general location, under roughly similar circumstances; and, before reaching his conclusion to admit the evidence, the judge balanced, as F. Rule Ev. 403 requires, the probative value against the prejudicial effect of the evidence. To be sure, *all* evidence incriminating a defendant is, in one sense of the term, "prejudicial" to him: that is, it does harm to him. In that sense, the more pertinent evidence is, the more prejudicial it is. What "prejudice" as used in Rule 403 means is that the admission is, as the rule itself literally requires, "unfair" rather than "harmful." In the instant case, Judge Sweet reasonably concluded that the admission of the similar evidence did not involve "the danger of unfair prejudice." F. Rule Ev. 403.

*Affirmed.*

CARDAMONE, Circuit Judge, dissenting:

Respectfully, I dissent and vote to remand this case to the district court for it to make a finding as to whether Jimenez made a knowing and intelligent waiver of a constitutional right. The district court failed to recognize Jimenez' statement as being obtained in derogation of his Fifth Amendment right against self-incrimination. Instead, it viewed the failure promptly to object to the officer's testimony as part of defense counsel's trial strategy. The district court said: "Having knowledge of the grounds upon which an objection to the evidence could have been made, counsel delayed raising an objection until the close of the government's case, over a full day and three witnesses later, [sic] constitutes waiver."

Ordinarily, admission of testimony without objection may constitute a waiver, even of a *Miranda* violation. If that were the case here, I would join the majority in affirming. But Jimenez' statement cannot be characterized simply as an unwarned but voluntary admission obtained in violation of *Miranda*. Rather, it was a coerced and unwarned statement that was obtained in violation of Jimenez' Fifth Amendment rights. The Supreme Court has recently noted that *Miranda* warnings are not constitutionally mandated, but serve instead as a prophylactic measure designed to insure that the right against compulsory self-incrimination is protected. *See New York v. Quarles*, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984).

> The Fifth Amendment prohibits use by the prosecution in its case in chief only of *compelled* testimony. Failure to administer *Miranda* warnings creates a presumption of compulsion. Consequently, unwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under *Miranda*.

*Oregon v. Elstad*, —— U.S. ——, 105 S.Ct. 1285, 1292, 84 L.Ed.2d 222 (1985). In *Elstad*, the Supreme Court observed that while an unwarned admission taken in violation of *Miranda* would be suppressed, the fruits of that confession, including sub-

sequent confessions, witnesses, or physical evidence, would not be similarly suppressed unless the initial confession was coerced and involuntarily made in violation of the Fifth Amendment. *Id.*

Here, Jimenez' *Miranda*-less statement *was* coerced under circumstances calculated to undermine his ability to exercise his free will. Jimenez was rear-handcuffed and held at gunpoint by four or more government agents when he was asked where he had been. Such circumstances so clearly indicate a lack of voluntariness and free will that they are sufficient to satisfy the compulsion element of a Fifth Amendment violation as a matter of law.

Having established a constitutional deprivation the next question is what standard governs its waiver. The district court apparently thought such right could be waived as a matter of trial tactics. The majority affirms contenting itself simply by observing that the finding of a trial tactic was not clearly erroneous. This conclusion fails to deal with the legal proposition before us—which is, did the failure by Jimenez' counsel to object to the introduction into evidence of Jimenez' coerced statement constitute a voluntary and intelligent waiver of a right to object to evidence obtained in violation of a constitutional right.

The law is clear that Jimenez' rights to assert this constitutional violation could only have been waived by him or his counsel; and then only if done voluntarily and intelligently. *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938); *see Brady v. United States*, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970); *Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969). Defense counsel may have erred by not recognizing the *Miranda* violation after Casey's testimony, or by waiting to raise an objection until a later point in the trial. Yet, even assuming this to be a trial tactic, it defies logic to leap from that presumption to the conclusion that Jimenez' rights therefore were knowingly and voluntarily waived.

When a constitutional right is not at stake—for example, in the case of a voluntary but unwarned *Miranda*-less statement—the proof necessary to establish a waiver is less, because the underlying right is less important. But a constitutional right may not be held to have been waived without a finding first having been made that defendant knew such right was being sacrificed and voluntarily consented. Inasmuch as the district court made no findings on this issue, such failure was a plain error of law that requires a remand for that purpose.