Salih SEVENCAN, Petitioner,

v.

Victor HERBERT, Superintendent, Attica Correctional Facility, Respondent.

No. 00 CV 4001(ARR).

United States District Court, E.D. New York.

July 31, 2001.

Georgia Hinde, New York City, for Petitioner.

Phyllis Mintz, Sholom Twersky, Suzanne Corhan, Office of the District Attorney, Brooklyn, NY, for Respondent.

Neil Checkman, New York City, for Jacinta Asillo Sevencan.

---

## OPINION AND ORDER

ROSS, District Judge.

The petitioner, Salih Sevencan, has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.[1] The petition and the respondent's opposition raise the two primary questions arising from the exclusion of the petitioner's wife from a portion of his state court trial. The first concerns whether a federal court conducting habeas review may consider evidence regarding the propriety of a family member's exclusion when the trial court failed

---

**1.** The petitioner identified Charles J. Hynes, the District Attorney for Kings County, as the respondent in this case. Mr. Herbert, the state officer who actually has custody over Mr. Sevencan, has been substituted pursuant to Rule 2(a) of the Federal Rules Governing Section 2254 Cases.

to conduct an adequate inquiry into the matter. The second question is whether evidence of a family member's personal connections to a defendant's co-conspirators may justify exclusion when threats have been made on the life of a witness. Because both questions are answered in the affirmative, and for the other reasons set forth below, the petition is denied.

## Background

### Trial and Appeal

Between June 3 and September 23, 1993, Mr. Sevencan and four co-defendants, Huseyin Akaydin, Alihasan Alkan, Kerim Igun, and Djavid Shehu, were tried in the Supreme Court for Kings County before Judge Edward M. Rappaport on various charges stemming from their participation in a conspiracy to import heroin from Turkey and sell it in the United States. The charges included drug sale and possession counts as well as weapon possession and conspiracy to commit murder.

At trial, the state's witnesses included two undercover police officers. The first of these officers, Undercover Number 13564, provided brief, limited testimony about intercepted telephone calls, mostly relating to co-defendant Shehu. *See* Tr. 292–311. The second officer, Number 4126, provided far more significant testimony, serving as the state's primary witness against Mr. Sevencan and others. Officer 4126 testified that, posing as an individual named Vinny Parnisi, he purchased heroin from the petitioner and an individual named Turon Taspinar in September 1991. A month later, in an audiotaped conversation, Mr. Sevencan offered to give the officer two kilograms of heroin if he would shoot a man named Mahmut, who had apparently stolen ten to fifteen kilograms of heroin from the petitioner's organization. Over the following months, the officer conducted further heroin transactions with Mr. Sevencan and Mr. Taspinar, who at times participated by telephone from Turkey. During the state's direct case, Officer 4126 testified for twelve trial days between June 16 and July 7, 1993. *See id.* 1524–2792.

Before the first undercover officer testified, the state asked Judge Rappaport to close the courtroom to members of the public. The court then conducted a hearing at which Officer 13564 stated that, although he did not work undercover in the case at hand, he had since begun conducting undercover narcotics purchases in Queens and carrying out two long-term narcotics investigations. *See id.* 281–82. He further testified that about ten to fifteen subjects of his investigations had eluded arrest and that testifying in open court would threaten his safety and limit the effectiveness of his undercover work. *See id.* 283–84. After hearing the testimony, Judge Rappaport ordered the courtroom sealed. Immediately following his ruling, the attorneys for Mr. Alkan and Mr. Igun explicitly took exception. *See id.* 289. The judge then elaborated on his decision, stating that

> I'm doing it to protect the identity of this undercover who's presently working and doing undercover work, both so that he can be an effective police officer and as to his safety to his life [sic]. It's very clear to me, I'm convinced clearly that the proper way to protect this officer as he now works on the streets of Queens or anyplace in the City of New York is to take the action I have taken.

*Id.* 289–90. Following this explanation, the judge addressed defense counsel, including Al Meyerson, the attorney for Mr. Sevencan: "Mr. Rao has an exception. Mr. Militello has an exception. You have an exception, Mr. Meyerson, although you didn't take exception, and I guess Mr. O'Connor has it. That's my ruling.

There's nothing to debate." *Id.* 290. Mr. Meyerson then proceeded to clarify his understanding that one defendant's exception did not necessarily apply to all co-defendants, but he never disputed the court's recognition of an objection on this issue.

The state made a similar application to close the courtroom prior to the testimony of Officer 4126. Immediately after the prosecutor's request, the court asked defense counsel, "I assume that you're all objecting to that?," to which Mr. Meyerson responded, "Yes, your honor." *Id.* 1497. During the closure hearing, the officer testified that he had been working as an undercover officer throughout New York City, including in the Brooklyn South Major Narcotics Unit, for four-and-a-half years. His work included both narcotics purchases and long-term investigations. Approximately five to ten individuals targeted by his past investigations had not been arrested. *See id.* 1497–1501. In response to questions, the officer stated that testifying in an open courtroom would place his life in jeopardy and limit his ability to function as an undercover. *See id.* 1501–03. After the officer's testimony and an oral argument by the prosecutor, the judge asked counsel, "Who wants to argue for the defense?" Counsel for Mr. Igun then made an argument against the closure, beginning with the statement, "We oppose the closing of the courtroom." *Id.* 1513. At the end of the proceeding, Judge Rappaport ordered the courtroom sealed. He noted the importance of an open trial and then stated that

what is most compelling in assessing [the undercover's] safety is not what happened in the past but what is happening in the present and in the future, and if a person is still acting in an undercover capacity in ongoing cases, and particularly, as has been testified here, that that work brings him into this

borough ... it is proper to close the courtroom.

*Id.* 1515. Following some additional discussion regarding whether law interns and other attorneys would be admitted, Judge Rappaport remarked that

a lawyer is a lawyer, and we'[re] sorry about spectators, family, I mean, another matter, something that [the prosecutor] can't exclude from the courtroom is the two defendants on bail, they're going to walk out, I mean, the family—there's always a certain amount of risk in everything we do and we try to do it.

*Id.* 1519.

On June 24, 1993, while the undercover was still testifying, Judge Rappaport informed the attorneys that, as late as that day, threats had been made against the life of Undercover 4126 and the lead prosecutor, Suzanne Corhan. *See id.* 2162. The judge noted that the threats were "a specific threat with this case; it's not some general thing. I mean, ... 'lay off, loosen up, or we're going to kill you, you bitch' and stuff like that. I don't know who's calling." *Id.* 2163. In response to the threats, Judge Rappaport explained, security had been increased around the courtroom. *See id.* 2166.

Twelve calendar days and three trial days later, on July 6, Mr. Sevencan's wife, Jacinta Asillo Sevencan, appeared at the courtroom, and the following conversation occurred at sidebar:

Mr. Meyerson: Judge, the defendant's wife is here and works all the time. This is practically the only day she can get here and would like to come in. I understand-

The Court: The courtroom is sealed.

Mr. Meyerson: Yes, it is. That's why I'm applying to you it be allowed-

The Court: The reason we seal it is to protect the undercover. I don't think she falls within the exceptions I've created. What's the district attorney's position?

Ms. Corhan: I would object.

The Court: Your application is denied. *Id.* 2550.

At the conclusion of the trial, the jury convicted Mr. Sevencan of three counts of criminal sale of a controlled substance in the first degree, two counts of criminal sale of a controlled substance in the third degree, one count of criminal possession of a weapon in the fourth degree, and one count of conspiracy in the second degree. The jury acquitted Mr. Sevencan of one count of second degree conspiracy relating to the murder plot. Judge Rappaport sentenced the petitioner to consecutive terms of twenty-five years to life on each of the two counts of first degree sale of a controlled substance, as well as concurrent terms of twenty-five years to life for the other first degree sale count, eight-and-one-third to twenty-five years for the third degree sale counts and the conspiracy count, and one year for the fourth degree weapon count.

Mr. Sevencan appealed his conviction to the Appellate Division of the Supreme Court. His brief raised a number of arguments, including claims that he was denied a public trial by the exclusion of his wife and by the general closure of the courtroom during the undercover officers' testimony, that he was denied a fair trial by the court's refusal to order the disclosure of a confidential informant's name, that the trial court erroneously admitted evidence of uncharged crimes as well as photocopied evidence, that the court improperly limited his attorney's summation, that he was denied a fair trial by the manner in which Judge Rappaport presided over the trial, and that ex parte communications between the prosecutor and the judge violated his due process rights.

In a decision issued on February 1, 1999, the Appellate Division affirmed Mr. Sevencan's conviction. The court addressed the closure claim first:

The defendant contends that he was denied his right to a public trial when the trial court closed the courtroom during the testimony of two undercover police officers. However, his present claim was waived by his failure to object to the closures at trial, and, in any event, is without merit.

*People v. Sevencan,* 258 A.D.2d 485, 685 N.Y.S.2d 735, 736 (1999) (citing *People v. Akaydin,* 258 A.D.2d 466, 685 N.Y.S.2d 737 (1999)) (companion case)[2]. The court went on to hold that the claim regarding the trial judge's behavior was unpreserved and without merit, that there was no error in the refusal to disclose the identity of the confidential informant, and that the ex parte conference did not require reversal. At the end of its opinion, the Appellate Division noted that "[t]he defendant's remaining contentions are either unpreserved for appellate review or without merit." *Id.* at 737. On February 25; 1999, Mr. Sevencan, through counsel, requested leave to challenge his conviction in front of the New York Court of Appeals on the basis of the courtroom closure, the refusal to disclose the informant's identity,

---

**2.** In *Akaydin,* which was decided by the same panel who decided Mr. Sevencan's case on the same day, the Appellate Division rejected various grounds for appeal advanced by one of Mr. Sevencan's co-defendants. With regard to Mr. Akaydin's courtroom closure argument, the court held on the merits that "[t]he hearing testimony established that closure was necessary to protect the safety of the officers and the integrity of their ongoing investigations." 685 N.Y.S.2d at 738.

and the limitation of closing arguments. The Court of Appeals denied this request on August 31, 1999. *See People v. Sevencan*, 93 N.Y.2d 1027, 697 N.Y.S.2d 586, 719 N.E.2d 947 (1999).

Meanwhile, on March 2, 1998, Mr. Sevencan filed a motion to vacate his conviction pursuant to Section 440.10 of the New York Criminal Procedure Law, arguing that his trial counsel performed ineffectively by failing to object to the closure of the courtroom and the admission of certain audiotaped remarks. The Supreme Court denied his motion on December 23, 1998 because Mr. Sevencan failed to raise the issue on appeal and because he received adequate representation in any event. The Appellate Division denied leave to appeal that ruling on April 8, 1999.

### The Instant Petition

Mr. Sevencan now raises five arguments in his petition for a writ of habeas corpus. First, he claims that the trial court deprived him of a fair trial by closing the courtroom to members of the public, including his wife. Second, he states that the trial court denied his Sixth and Fourteenth Amendment rights to a fair trial and due process by conducting *ex parte* conferences. Third, he alleges that the trial court denied him a fair trial by admitting into evidence a photocopy of a diagram that he had drawn. Fourth, he asserts that the trial court improperly limited his counsel's closing argument. Finally, he argues that the trial judge denied him a fair trial by refusing to order the disclosure of the name of a confidential informant.

After an initial round of briefing in which Mr. Sevencan proceeded *pro se*, the court appointed counsel to represent the petitioner. The subsequent briefs from both parties focused on the question of courtroom closure, specifically the exclusion of the petitioner's wife. As will be discussed in more detail *infra*, this court collected further evidence on the issue pursuant to *Nieblas v. Smith*, 204 F.3d 29 (2d Cir.1999). The evidence consisted of an affidavit and testimony from Undercover 4126, audiotapes featuring conversations between Mrs. Sevencan and her husband and other members of his organization, and an affidavit and testimony from Mrs. Sevencan.

### Undercover 4126

Undercover 4126 testified that he has worked as an undercover agent for approximately fourteen years, during which time he has dealt with both street level offenders and organized crime syndicates. Over the years, he has had numerous contracts put on his life. 6/8/01 Tr. 3–5. Between September and December 1991, the officer, posing as Vinny, infiltrated the 'petitioner's organization after being introduced to Mr. Sevencan and Mr. Taspinar as a member of an Italian crime family. *See id.* 5. Officer 4126 explained that the organization was managed by a figure in Turkey known as "Papa." Mr. Taspinar, who traveled between Brooklyn and Turkey, served as the primary contact with Papa. The agent described Mr. Sevencan's role in the organization as that of a "boss" in New York and explained that those who worked under Mr. Sevencan included his brother Habib[3] and Mr. Alkan, the latter in the role of armed bodyguard. The organization had other associates and contacts working at airports and elsewhere. *See id.* 7–8. During his time with the organization, the undercover purchased

---

**3.** Habib Sevencan was indicted with the petitioner and pled guilty to criminal facilitation before the completion of the trial.

drugs and received the offer from Mr. Sevencan and Mr. Taspinar to murder a man in exchange for heroin. Mr. Sevencan also told him that he was interested in purchasing AK–47 automatic rifles and informed him that he had killed a man in Turkey and that Mr. Alkan had murdered somebody in the Gravesend section of south Brooklyn. *See id.* 6.

The undercover's infiltration of the organization required him to work in an area inhabited by a large Turkish population around Neptune and Coney Island Avenues in the Brighton Beach area of south Brooklyn. At the time of the trial, the undercover planned to conduct further dealings in that area, and he has in fact done so. *See id.* 9, 28.

In light of the death threats that he had previously received and the fact that the targets of his investigations could inflict harm if they learned of his identity, the undercover testified that his life would be in danger if his identity were to be revealed. *See id.* 30. At the petitioner's trial, the danger was enhanced by the fact that Mr. Taspinar remained a fugitive. *See id.* at 13. For that reason, the officer took significant precautions when attending court. Early in his testimony, he always arrived at the courthouse accompanied by armed guards, using different cars and different entrances each day. After the death threat, security was heightened, and the officer began traveling with more people and wearing a bulletproof vest. *See id.* 15. Although he did not know at the time of the trial that Mrs. Sevencan had attempted to attend the proceedings during his testimony, the officer testified at the *Nieblas* hearing that he believed her to be an associate of her husband's organization, based on her conversations with

Habib Sevencan, her husband, and Mr. Taspinar, and stated that he would not have wanted her to watch his testimony. *See id.* 17. The agent expressed a concern in his affidavit that Mrs. Sevencan could have pointed him out to Mr. Taspinar, thus endangering his life. *See* 4126 Aff., ¶ 7.

*Audiotapes*

At the time of the *Nieblas* hearing, the state submitted to the court a series of taped conversations, recorded as part of the state's pre-trial investigation, containing evidence of Mrs. Sevencan's apparent connection to members of her husband's organization and knowledge of his activity. On some of the tapes, Mrs. Sevencan uses words that, according to the undercover, were also used by the organization as code language for drugs.[4] On one tape, for example, Mr. Sevencan speaks to her about receiving "fruits" from an individual named Husnu. Call no. 1703 (11/26/91) On another tape she speaks of bringing to Mr. Sevencan "from a restaurant beans." Mr. Sevencan responds by asking, "you know about this?," to which she responds that she does, after which he says, "okay, bring me honey." Call no. 1992 (12/4/91). Other tapes contain conversations between Mrs. Sevencan and Habib, *see, e.g.,* call nos. 1342 (11/9/91), 1477 (11/15/91), 1494 (11/16/91), and Mr. Alkan. *See, e.g.,* call nos. 1309 (11/8/91), 1489 (11/15/91), 1598 (11/21/91).

One conversation with Habib includes a discussion in which Habib tells Mrs. Sevencan that Mr. Sevencan is going to John F. Kennedy Airport because a friend is going to Turkey. Mrs. Sevencan responds, "Yeah... He told me he go to bring money for him." Call no. 1205 (11/3/91).

---

4. The petitioner does not dispute that the female voice on the tapes is that of Mrs. Sevencan.

In another conversation, Mrs. Sevencan speaks to Mr. Taspinar. At the end of a lengthy conversation with Mr. Taspinar, Mr. Sevencan puts her on the line, saying in Turkish "Brother this girl wants to say hi to you." Mrs. Sevencan takes the phone and says in English "Hi, Turon," after which pleasantries are exchanged and Mrs. Sevencan asks "how is your vacation?" Mr. Taspinar responds that he will be coming back soon and then asks to speak to Mr. Sevencan, to which Mrs. Sevencan replies "Okay, Turon. Goodbye. See, see you soon. Bye." Call no. 1993 (12/4/91).

In another tape, recorded a day after Mr. Sevencan sold two kilograms of heroin to the undercover, Mrs. Sevencan indicates that she understands the nature of Mr. Sevencan's business. Shortly after Mrs. Sevencan asks Mr. Sevencan if he has "something wrong with the police" and Mr. Sevencan replies, "No, no, no," Mr. Sevencan asks her if she wants to see money, to which she responds "You make money" and then something inaudible followed by "what kind job." Mr. Sevencan then says that he will give her a number, and whispers "Hundred fifty thousand dollars." When he asks her if she understands, she answers "Yeah, one thousand." Mr. Sevencan then laughs, she responds "One hundred thousand," and he then corrects her by saying "One hundred fifty thousand." The following exchange ensues:

Salih: I know you don't want to believe me now.

Jacinta: I believe you I know, I know what kind of job you doing.

Salih: Shut up.

Jacinta: No but I keep it in my, I guessed, my ... nobody see.

.　　　.　　　.　　　.　　　.

Jacinta: Honey, if I know, I keep what you told me last time, then you know,

but I don't say nobody. Just I keep myself.

Salih: I know, I know.

Jacinta: You don't really believe me. You think I say ...

.　　　.　　　.　　　.　　　.

Salih: I believe you, honey. If you say that, I kill you man, honest.

Jacinta: No, hon, don't think, don't think that ... because I'm not ... I, I, I'm not like you think.

Salih: I know I know. (Sigh) So.

Jacinta: (laugh) I know. Good money, good money, honey.

Call no. 951 (10/25/91).

*Mrs. Sevencan*

In an affidavit and testimony, Mrs. Sevencan asserted that she "never had any suspicion" about her husband's criminal activity and that his arrest came as a "terrible surprise," Sevencan Aff., ¶ 7, that left her "disappointed and in shock." 7/9/01 Tr. 23. Prior to Mr. Sevencan's arrest, the two were not yet married and lived in separate homes. As far as she knew, his only occupations were work as a fruit vendor and as a restaurant employee. *See id.* at 8. She stated that she knew Habib and that Mr. Sevencan had introduced her to Mr. Alkan one or two times, but said that she did not recall having a conversation with Mr. Taspinar even though she recognized her voice on the tape. *See* Sevencan Aff., ¶¶ 4, 6. She also explained that she came to the trial on the one day that she could get away from her child care work and claimed that she would not have revealed information about the witness to anyone if she had been allowed to stay. *See id.* ¶ 9.

At the hearing, Mrs. Sevencan testified that she lives at a residence near Kings Highway and Avenue R in Brooklyn, shops on Kings Highway and Avenue U, takes

her son to a doctor on Avenue U, and herself goes to Coney Island Hospital near Neptune Avenue. *See* 7/9/01 Tr. 4, 30–31. For a year, she also took her son to school on Neptune Avenue. *See id.* at 16. Mrs. Sevencan further testified, contrary to her affidavit, that Mr. Alkan was a friend of hers before she met Mr. Sevencan and that Mr. Alkan had in fact introduced her to her future husband, *see id.* 37–41. In addition to her husband, Mrs. Sevencan remained in contact with Habib and Mr. Alkan after their arrests. *See id.* 56–57. She has no other friends in Brooklyn. *See id.* 26. Mrs. Sevencan reiterated that she never met Mr. Taspinar and stated that she would have had no idea how to contact him after her husband's arrest. *Id.* 11–12. Mrs. Sevencan had no recollection of any of the conversations recorded on the audiotapes.

### Courtroom Closure

Mr. Sevencan's first claim, and the focus of the parties' submissions, is that the closure of the courtroom, particularly the exclusion of his wife, violated the right to a public trial guaranteed by the Sixth Amendment of the Constitution.

#### Procedural Bar

As a threshold matter, the respondent argues that Mr. Sevencan cannot now bring this claim because it is procedurally barred from federal habeas corpus review, having been rejected by the Appellate Division of the New York Supreme Court on an independent and adequate state procedural ground. Specifically, the respondent points to the Appellate Division's conclusion that the closure claim "was waived by his failure to object to the closures at trial, and, in any event, is without merit." 685 N.Y.S.2d at 736.

■ While New York's contemporaneous objection rule is itself legitimate, *see Garcia v. Lewis,* 188 F.3d 71 (2d Cir.1999),

the state court record does not necessarily support its application as a procedural bar in this case. As the Court of Appeals has explained, the purpose of the rule is to ensure that an issue on appeal is "brought to the attention of the trial court at a time and in a way that [gives] the latter the opportunity to remedy the problem and thereby avert reversible error." *People v. Luperon,* 85 N.Y.2d 71, 78, 623 N.Y.S.2d 735, 647 N.E.2d 1243 (1995). When the court was closed during the first undercover officer's testimony, Judge Rappaport explicitly noted objections for Mr. Sevencan's counsel as well as the other defense attorneys. Before the closure hearing for the second officer, Mr. Sevencan's attorney explicitly stated his objection on the record. At the end of the hearing, counsel for Mr. Igun, speaking on behalf of all of the defendants, reiterated the defendants' opposition to the closure. The respondent has identified no cases, nor has the court encountered any, indicating that the objections were inadequate. In fact, it seems that counsel probably brought the petitioner's concerns to the attention of the trial court in a way that gave the court the opportunity to remedy any possible error. Furthermore, there is special reason to doubt the evenhanded application of the procedural bar to Mr. Sevencan's closure claim in light of the fact that the same panel of the Appellate Division, acting on the same day, did not invoke a bar to co-defendant Akaydin's closure claim. The record shows that Mr. Akaydin's counsel actually made no more specific objection than did Mr. Sevencan's counsel to the first closure and was in fact less vocal during the second closure. *See Hathorn v. Lovorn,* 457 U.S. 255, 263, 102 S.Ct. 2421, 2426, 72 L.Ed.2d 824 (1982) ("State courts may not avoid deciding federal issues by invoking procedural rules that they do not apply evenhandedly to all similar claims.").

■ The Appellate Division's decision leaves unclear whether the procedural bar ruling applies to the specific claim regarding the exclusion of Mr. Sevencan's wife. Given the appellate court's failure to mention that separate issue in its discussion of the general closure and its specific reference to the *Akaydin* decision, which did not involve a family exclusion claim, it is possible that the state court did not intend its finding of a procedural bar to encompass the claim about Mrs. Sevencan. Instead, it is entirely possible that the court intended for that particular issue to be covered by the final, catch-all statement that the petitioner's "remaining contentions are either unpreserved for appellate review or without merit." 685 N.Y.S.2d at 737. When a state appellate court relies on language suggesting either a procedural bar or lack of merit, and cites no legal authorities to help discern the basis for rejecting the claim, a federal court should not deny the claim on procedural grounds. *See, e.g., Galarza v. Keane,* 252 F.3d 630, 637 (2d Cir.2001) (noting "established precedent" that ambiguous reference to state procedural bar does not preclude federal habeas review). In addition, it appears from the record that Mr. Sevencan's objection to the exclusion of his wife may have been adequately brought to Judge Rappaport's attention when counsel specifically applied for permission for her admission. *See, e.g., People v. Rosen,* 81 N.Y.2d 237, 245, 597 N.Y.S.2d 914, 613 N.E.2d 946 (1993) (explaining, in context other than closure, that "defendant's specific application [to attend sidebar] and the court's equally specific ruling were sufficient to preserve the issue for appeal") (citing state contemporaneous objection statute).

Ultimately, it is unnecessary to reach a final determination on the rather hazy questions surrounding the procedural bar in light of the finding, discussed *infra,* that the closure of the courtroom was proper.

*See Nieblas,* 204 F.3d at 31 ("Because we ultimately find that the courtroom closure was proper, however, we need not consider these procedural arguments."); *Brown v. Kuhlmann,* 142 F.3d 529, 534 (2d Cir.1998) ("Because we do not regard the courtroom closure here to have been improper ..., we do not pause to consider whether the Appellate Division's preservation ruling was consistent with New York law" or otherwise entitled to deference) (internal citations omitted).

### Exclusion of Petitioner's Wife

#### Legal Standards

The federal habeas corpus statute provides a remedy for state prisoners whose continued custody is "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Errors of state law are not cognizable on federal habeas review, *see, e.g., Estelle v. McGuire,* 502 U.S. 62, 71–72, 112 S.Ct. 475, 481–82, 116 L.Ed.2d 385 (1991), and petitioners bear the burden of proving violations of federal law by a preponderance of the evidence. *See Jones v. Vacco,* 126 F.3d 408, 415 (2d Cir.1997). Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a court may not grant relief unless it finds that the state court's adjudication of the merits of the petitioner's claim resulted in either (1) a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court, or (2) a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d); *Williams v. Taylor,* 529 U.S. 362, 412, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000) (explaining that AEDPA "places a new constraint" on federal habeas power).

Mr. Sevencan claims that the trial court's exclusion of his wife from the courtroom violated his right to a public trial under the Sixth Amendment of the Constitution, which provides that "in all criminal prosecutions, the accused shall enjoy the right to a . . . public trial." U.S. Const. amend. VI; *see also Duncan v. Louisiana,* 391 U.S. 145, 148 n. 10, 88 S.Ct. 1444, 1447, 20 L.Ed.2d 491 (1968) (holding that right to a public trial applies to states under the Fourteenth Amendment). For Supreme Court precedent, Mr. Sevencan relies on two cases. In the first, *In re Oliver,* 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682 (1948), Justice Black explained the history and value of the public trial right and stated in particular that "without exception all courts have held that an accused is at the very least entitled to have his friends, relatives and counsel present, no matter with what offense he may be charged." *Id.* at 271–72, 68 S.Ct. at 507.

The second case on which the petitioner relies, *Waller v. Georgia,* 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984), discusses the situations in which limitations can be placed on public access to a trial. Though fundamental, the Sixth Amendment's open trial right is not absolute. Citing earlier decisions analyzing the limitations placed on the right of the press to attend proceedings under the First Amendment, the Court explained that "[t]he presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Id.* at 45, 104 S.Ct. at 2215 (quoting *Press–Enter. Co. v. Superior Court of California,* 464 U.S. 501, 510, 104 S.Ct. 819, 824, 78 L.Ed.2d 629 (1984)). In order to close a courtroom or restrict access in any way, the Court held, a trial judge must conduct a four-part inquiry. *See id.* at 48, 104 S.Ct. 2210, 104 S.Ct. at

2216. First, "the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced." *Id.* Second, the court must ensure that the closure is "no broader than necessary to protect that interest." *Id.* Third, "the trial court must consider reasonable alternatives to closing the proceeding," *id.,* and fourth, "it must make findings adequate to support the closure." *Id.* Under *Waller,* no showing of prejudice is necessary when the right to a public trial has been violated. *See id.* at 50 n. 9, 104 S.Ct. at 2217; *see also, e.g., Guzman v. Scully,* 80 F.3d 772, 776 (2d Cir.1996) (noting that, under *Waller,* "a defendant whose right to a public trial has been violated need not show that he suffered any prejudice, as the doctrine of harmless error does not apply").

The Second Circuit brought the holdings of *Oliver* and *Waller* together when it held in *Vidal v. Williams,* 31 F.3d 67 (2d Cir. 1994), that a court must be particularly careful in excluding any members of a defendant's family from the courtroom. Applying *Waller*'s four-part test and citing *Oliver*'s "special concern for assuring the attendance of family members of the accused," *id.* at 69, the Circuit granted a writ of habeas corpus to an individual whose parents were kept out of the courtroom during the testimony of an undercover officer because the trial court had failed to make a specific finding that the parents posed any threat to the officer. *See id.* The Circuit reached similar results in *Guzman,* 80 F.3d 772, and *English v. Artuz,* 164 F.3d 105 (2d Cir.1998). In both cases, the Circuit granted habeas relief in light of the trial judge's decision to exclude family members during portions of trials without making an adequate finding that the specific family members posed any threat to the safety of the testifying witness. Of course, as will be discussed in more detail *infra,* the need to make specific findings

about the potential risks posed by family members does not mean that family members can never be excluded. When courts are able to make a sufficient finding that members of a defendant's family do pose a legitimate threat to the safety of the witness or another compelling interest, exclusion is acceptable. *See, e.g., Woods v. Kuhlmann,* 977 F.2d 74 (2d Cir.1992) (denying habeas relief to petitioner whose relatives were excluded after trial judge considered evidence that family members had intimidated testifying witness).

Although *Oliver, Waller,* and *Vidal* indicate that a trial judge's failure to conduct an adequate inquiry and make sufficient findings on the record alone provides a basis for habeas relief, the Second Circuit concluded in *Nieblas,* 204 F.3d 29, that such a result is not inevitable. At the petitioner's state court trial in that case, the prosecution asked the court to seal the courtroom during the testimony of an undercover officer. Defense counsel objected and a brief hearing was held, at which the officer testified that his identity was hidden for safety reasons and that courtrooms were always closed during his testimony. The trial judge ordered closure in the interest of the officer's safety, and there were no further objections. When the petitioner sought habeas relief under *Waller,* arguing that the trial court failed to make adequate findings to support closure, now-Chief Judge Korman sought further evidence from the parties and conducted a hearing in order to determine whether there existed facts to justify the closure. *See id.* at 30–31. In light of the evidence developed in the habeas proceedings, Judge Korman denied the petition.

On review, the Circuit upheld the district court's decision to receive and consider evidence not developed in the initial state court proceedings. Explaining that "[a] district court has broad discretion to

hear further evidence in habeas cases," *id.* at 31, the court held that there are certain circumstances under which the receipt of further evidence is particularly appropriate. One such circumstance arises when "the defendant may have sandbagged the state or otherwise engaged in strategic manipulation during the state court proceeding." *Id.* at 32. In *Nieblas,* for example, "defense counsel objected in a perfunctory way to the prosecution's request to close the courtroom, thereby increasing the likelihood that the court would close the proceedings erroneously without a fully developed justification on the record." *Id.* Furthermore, the Circuit explained that when another reason to conduct a hearing is present, "it is particularly appropriate for a habeas court to gather additional evidence—rather than granting the defendant the 'windfall' of a new trial—where the alleged constitutional violation does not affect the fairness of the outcome at trial, as in courtroom closure cases." *Id.* (citing *Waller,* 467 U.S. at 50, 104 S.Ct. at 2217).

*Nieblas* dictates that it is appropriate to consider additional evidence in the present case. As in *Nieblas,* defense counsel's objection to the exclusion of Mrs. Sevencan at trial, though probably adequate to overcome the procedural bar discussed *supra,* cannot be described as anything more than "perfunctory." Even though counsel did object to the general closure and request that the petitioner's wife be permitted to enter the courtroom, he never reiterated his objection after the court declined to allow her in, nor did he articulate a request for specific findings regarding any danger posed by the wife. Like the defendant in *Nieblas,* the petitioner here "shares the responsibility for the error because the record at trial might have been more fully developed had the defendant raised more specific objections to the closure and the state's proffered justifica-

tions." *Id.* Furthermore, granting habeas relief on the simple failure of the trial court to conduct an adequate inquiry would indeed result in the type of "windfall" that *Nieblas* seeks to avoid. While the need for open trials obviously deserves great respect, "the alleged constitutional violation [did] not affect the fairness of the outcome at trial." *Id.* Unlike this case, *Nieblas* did not involve the exclusion of family members, but the distinction is insignificant. While the special concern articulated in *Oliver* and *Vidal* requires a specific connection between family members and the need for closure, there is no reason why such a connection cannot be developed on habeas review.

■ Under all of the cases discussed above, it is necessary to conduct the multipronged inquiry set forth in *Waller*, demanding a clear connection between the exclusion of Mrs. Sevencan and an important interest in closure, while taking into account the evidence developed over the course of this proceeding under *Nieblas*. *See, e.g., Gonzalez v. Quinones,* 211 F.3d 735, 739 (2d Cir.2000) (holding, under *Nieblas*, that "[i]f, upon reviewing the results of a reconstruction hearing, the district court determines that the People have shown justification under the *Waller* standards for closing the court during the testimony of the undercover officer, then the district court should deny the petition").

### Discussion

### 1. Overriding Interest

■ Under the first prong of *Waller*, the party seeking closure of the courtroom must show an overriding interest that is likely to be prejudiced if the courtroom remains open. Recognizing that "open trials are strongly favored," the Second Circuit held in *Ayala v. Speckard,* 131 F.3d 62, 70 (2d Cir.1997) (en banc), that a judge may find that closure is necessary if there

exists "persuasive evidence of a serious risk to an important interest." *Id.* The Circuit went on to articulate that "the more extensive is the closure requested, the greater must be the gravity of the required interest and the likelihood of risk to that interest." *Id.* This standard was recently elaborated in *Bowden v. Keane,* 237 F.3d 125 (2d Cir.2001), which held that, once the initial risk is found, "closure is permissible so long as there is a positive and proportional relationship between (1) the extent of the closure and (2) the 'gravity' of the interest that assertedly justifies the closure, discounted by the probability of the interest being harmed if the courtroom is not closed." *Id.* at 128.

Courts have agreed that protecting the safety and security of a testifying undercover law enforcement officer conducting ongoing operations constitutes an important interest. *See, e.g., id.* at 129; *Brown,* 142 F.3d at 537–38. When the prosecution seeks to exclude a family member from the courtroom during the testimony of an undercover officer, *Vidal* mandates that the state show a likelihood that the specific family member's presence in court would seriously increase the chance of some harm coming to the officer or his continuing work.

In this case, there can be no dispute that the safety of Officer 4126 constituted an important interest. Both at the closure hearing during the trial and at this court's *Nieblas* hearing, the undercover explained that he has been and remains involved in a number of investigations of often-dangerous individuals and criminal enterprises. Like many undercover agents, he is understandably concerned that if the targets of his investigations find out that he is a police officer, they will pose a serious risk to both his personal safety and the continued success of his investigations.

Understanding that the undercover's safety and security is itself an important interest, it becomes necessary to ask whether Mrs. Sevencan's presence in the courtroom during his testimony would have posed a risk to that interest. The parties agree that under *Vidal* and subsequent cases, the court must ask two main questions: first, whether it was likely that Mrs. Sevencan would have encountered the officer during his operations; and second, whether she was inclined to harm the officer in any way. *See, e.g., Vidal,* 31 F.3d at 69 (analyzing family members' inclination to harm officer and likelihood of encounter); *Yung v. Walker,* 143 F.Supp.2d 262, 271–72 (S.D.N.Y.2001) (same).

The respondent's concern on the first of these questions is quite simple. If Mrs. Sevencan had been admitted to the courtroom, the state argues, she would have seen Officer 4126 and would therefore have been able to identify him if she saw him subsequently on the street. This concern is valid. Both before and after the trial, the undercover conducted his operations in the same area of south Brooklyn in which Mrs. Sevencan lived, shopped, and carried out other activities. In fact, the entire area from her house on the north end to the central part of the Turkish community on Neptune Avenue in the south fills no more than two miles. *See* Respondent's Ex. 1, 6/8/01 Hearing. Although it is true that people within the same geographic area may never see each other in a city as condensed as New York, *see Vidal,* 31 F.3d at 69 ("In New York City, two locations three miles apart are hardly in the same vicinity."), there is ample reason to conclude that Mrs. Sevencan could have seen the undercover while shopping in the area near her home, taking her child to school, or visiting a doctor.

The question of Mrs. Sevencan's inclination to harm the undercover officer is more difficult. As an initial matter, it does not appear that Mrs. Sevencan herself posed a direct risk to the undercover officer. Although the respondent made some effort to persuade the court of Mrs. Sevencan's involvement in the narcotics business by playing tapes in which she arguably spoke in code with such words as "fruit" and "restaurant," the conversations are open to equally innocent explanations, particularly in light of the fact that Mr. Sevencan did indeed work as a fruit vendor. Even if Mrs. Sevencan had herself been involved in the drug business, there exists no evidence implicating her in any of the more violent activities described by the undercover.

■ However, a direct physical threat is not necessary to justify courtroom closure when a family member could report her physical description of the witness to another individual with both the ability and the inclination to cause harm. In *Woods,* the Second Circuit found that the trial judge was justified in excluding all members of the defendant's family even though only certain members had previously threatened the witness. The trial court in that case rejected the possibility of excluding only those who had made the threat because "the remaining family members could 'tell the other' of the substance of [the witness]'s testimony." 977 F.2d at 77. *Cf. United States v. Doe,* 63 F.3d 121, 130 (2d Cir.1995) (explaining that direct threat from excluded individual is not necessary "in the context of criminal organizations," where "[t]he problem of retaliatory acts against those producing adverse testimony is especially acute"); *Cadilla v. Johnson,* 119 F.Supp.2d 366, 377 (S.D.N.Y.2000) (upholding exclusion, not in family context, of members of the public during testimony of undercover agent because "if someone saw

him who frequented that area, and they informed drug dealers of his identity, something could happen to him and his work would clearly be impeded").

In this case, the evidence established that Mrs. Sevencan did pose an indirect threat to the undercover. Officer 4126 testified that Mr. Sevencan's organization was very dangerous, as indicated by members' boasts of past killings, efforts to obtain weapons, and the attempt to hire the undercover to commit a murder. Although Mr. Sevencan, Mr. Alkan, and others were incarcerated pending trial, Mr. Taspinar remained at large as a fugitive, and the undercover specifically identified him as a danger. A few weeks into his testimony, the undercover's concerns about his safety escalated dramatically when a direct, specific threat was made on his life. The petitioner's present attempt to question whether the threat was connected to his trial is unconvincing in light of its timing during his testimony and the fact that a companion threat was made on the life of the prosecutor. While it is true that threats had previously been made against the officer regarding other cases, Judge Rappaport's impression that the threat was connected to the case before him was wholly justified.

As the undercover explained, steps were taken immediately after the threat on June 24, 1993 to increase the security around him on his way into and out of court, making it even more difficult for anyone to see him outside the courtroom. Only twelve calendar days and three trial sessions after the threat had been made, Mrs. Sevencan appeared at court for the first time. While it is entirely possible that July 6 was the only day on which she could leave her work, the timing of her arrival was close enough to the threat to arouse justifiable suspicion.

The evidence supports the fear that Mr. Taspinar could have used Mrs. Sevencan to locate the officer. Mrs. Sevencan's claim that she did not actually know Mr. Taspinar is directly undermined by the friendly, personal nature of her December 4, 1991 conversation with him, which includes casual banter and Mrs. Sevencan's parting comment that she would see Mr. Taspinar soon. Her attempt to distance herself from Mr. Taspinar is consistent with her similar attempt to downplay her relationship with Mr. Alkan. Despite claiming in her affidavit that she did not know Mr. Alkan until Mr. Sevencan introduced her to him, Mrs. Sevencan admitted at the hearing that Mr. Alkan was a friend of hers before she met her husband and that Mr. Alkan had in fact introduced her to Mr. Sevencan. Mrs. Sevencan also acknowledged that she has remained in contact with Mr. Alkan even after his arrest.

The concern about Mrs. Sevencan as a possible threat is not diminished by the assertion in her affidavit that she would never have identified the witness to anyone if she had seen him, or her claim that she was shocked and disappointed by her husband's illegal activities. The October 25, 1991 conversation between Mr. and Mrs. Sevencan reveals not only that she suspected he had problems with the police, but also that she understood the illegal nature of his lucrative business. Furthermore, the November 3, 1991 conversation between Mrs. Sevencan and Habib indicates that she knew that Mr. Sevencan was involved in delivering money from the United States to Turkey. It is hard to imagine why Mr. Sevencan would have told her that he was having money taken to Turkey if he did not trust her with at least some knowledge of his deeds.

The audiotapes and the hearing testimony reveal that Mrs. Sevencan is a timid, pliable woman deeply saddened by what

has happened to her husband. By her own account, she has few friends in the area. Given the state of her life following the apprehension of her husband, her relationship with Mr. Taspinar and others in the organization, and her own apparently suggestible nature, it is entirely possible that Mr. Taspinar could have prevailed upon Mrs. Sevencan to inform him if she saw the undercover anywhere in south Brooklyn. Such information would obviously have been invaluable to Mr. Taspinar or any other members of the organization interested in retaliation.

Given the rather unusual and unexplored nature of the *Nieblas* hearing, the petitioner asks the court to use the hindsight inherently available in such a proceeding to take into account the fact that no harm has actually been inflicted upon the undercover even though two· of Mr. Sevencan's co-defendants were not in custody during trial and Habib Sevencan has already been released from prison. *See* Petitioner's Post–Hearing Brief, Ex. C. Although *Nieblas* does not make clear whether a court conducting evidentiary analysis on habeas review is limited to considering facts available at the time of the closure, the analysis in this case has been limited to facts that could have been made available to the trial judge if he had held an inquiry when Mrs. Sevencan appeared. If subsequent facts were to be considered, however, the result would not change. While it is true that neither the co-defendants on bail nor Habib Sevencan ever harmed the undercover agent, the fact that no harm was done does not indicate that members of the conspiracy never attempted to retaliate, nor does it undermine the substantial risk that the officer could have been hurt if Mrs. Sevencan had seen him during the trial.

Even if no one fact adduced by the respondent supports the exclusion of the petitioner's wife when taken alone, the constellation of factors apparent from the evidence reveals that allowing Mrs. Sevencan into the trial would have posed a serious risk to the safety of the undercover officer and his ongoing investigations. Contrary to the petitioner's arguments, such a finding does not imply that all relatives of organized crime defendants must automatically be excluded from the courtroom during law enforcement testimony. Rather, the finding is limited to the unique, compelling circumstances of this case, where the closure was justified against a backdrop of direct threats from a violent organization with unarrested fugitives.

### 2. *No Broader than Necessary*

The exclusion of Mrs. Sevencan was no broader than necessary, as it did not cover any part of the trial other than the testimony of the undercover. Although the petitioner is correct in pointing out that the undercover was an essential witness, once it was determined that Mrs. Sevencan posed a potential risk to the witness, it would not have been proper or sensible for the court to allow her into the proceedings for even a portion of his testimony. While closure during the testimony · of a significant witness "requires that the state demonstrate 'a specific connection between the perceived threat to the officer and the officer's public testimony in the particular proceeding,'" *Bobb v. Senkowski,* 196 F.3d 350, 353 (2d Cir.1999) (quoting *Brown v. Andrews,* 180 F.3d 403, 407–08 (2d Cir. 1999)), that connection was clearly established here by the compelling risks and interests discussed *supra.*

It goes without saying that if Mrs. Sevencan created a risk by seeing the undercover in person, then that risk would have arisen even if she had seen him for only a short time. By the petitioner's own admission, Mrs. Sevencan did not attempt to

come to the trial during any other portions of the proceedings. If she had done so, she presumably would have been admitted. Because the courtroom was open at all times other than during the testimony of the undercover officers, the closure was no broader than necessary.[5]

### 3. Consideration of Alternatives

■ The third prong of *Waller* requires courts to consider alternatives to closing the courtroom. The Second Circuit has held that this requirement arises only if a party actually suggests alternatives, explaining that "the [Supreme] Court has never held that a criminal case defendant who has not requested a more limited alternative has a right to a new trial, just because the trial judge failed to consider . . . alternatives sua sponte." *Ayala*, 131 F.3d at 71.

At the hearing on this petition, the undercover explained that alternatives have been used during his testimony in other cases, such as the placement of a screen between himself and the spectators. *See* 6/8/01 Tr. 21, 60–61. No such alternatives were suggested by the parties in this case, either at the time of the initial closure or when the petitioner requested that his wife be allowed to enter. If alternatives had been suggested and the court had declined to do so, the defendant would have a stronger claim under this prong of *Waller*. Since no suggestions were made, however, *Ayala* prevents habeas relief based solely on the trial judge's failure to consider alternatives sua sponte. Furthermore, to the extent that the request for Mrs. Sevencan's admission was itself the suggestion of

an alternative to complete closure, then this prong was satisfied by the trial court's rejection of the option. *Nieblas* precludes this court from granting the writ simply on the ground that the trial court's consideration of the alternative was cursory at best.

### 4. Adequate Findings

■ The fourth prong of *Waller* requires trial judges to express on the record the reasons supporting the closure of the courtroom. In this case, Judge Rappaport certainly made no adequate findings regarding the exclusion of Mrs. Sevencan. While this may have provided a basis for reversal or remand on direct appeal, *Nieblas* holds that a state trial court's failure to make its findings clear on the record does not itself provide a basis for habeas relief. To apply the fourth prong of *Waller* on habeas review would run contrary to the holding of *Nieblas*, as there would be no reason for a habeas court to conduct an evidentiary inquiry if the trial court's failure to do so initially required the granting of the writ. Although the precise relationship between *Nieblas* and the fourth *Waller* prong is unclear, it is apparent from *Nieblas* that the trial judge's failure to make an adequate finding with regard to Mrs. Sevencan's exclusion does not, in and of itself, provide a basis for habeas corpus relief.

### Additional Closure Claims

■ In addition to the primary claim regarding the exclusion of his wife, Mr. Sevencan's petition alleges that the gener-

---

5. Some courts have analyzed the exclusion of family members under the second prong of *Waller*, treating the option of allowing relatives to enter as a narrow alternative to general closure of the courtroom. *See, e.g., English*, 164 F.3d at 108–09. Because the main issue in this petition is whether the exclusion of the petitioner's wife was warranted, and

not whether closure to the general public was in order, the merits of the decision to exclude Mrs. Sevencan were discussed under the first prong of *Waller*. To the extent that they constitute separate claims, the petitioner's arguments regarding the general closure are discussed *infra*.

al closure decisions for the two undercover officers violated his Sixth Amendment right to a public trial. The claim regarding the first undercover fails in light of the extremely limited nature of the closure. Even though Judge Rappaport made only broad findings that the officer's safety and effectiveness as an undercover could have been threatened by allowing any members of the public into the courtroom, such findings are sufficient given the relative insignificance and brevity of the officer's testimony. The officer's testimony, which filled only eighteen pages of the 6,610 page trial transcript, involved nothing more than the introduction of audiotapes containing the voice of co-defendant Shehu. In *Brown,* the Second Circuit held that when "the closure was brief and the testimony given during closure was merely corroborative[,] the state's burden ... was not a heavy one, and the limited likelihood that the undercover officer's safety would be prejudiced by an open courtroom ... had sufficient weight in the balance." 142 F.3d at 538; *see also Bobb*, 196 F.3d at 354 (explaining that particular connection between threat to officer and public testimony is not needed when undercover's testimony is insignificant part of evidence). With regard to the second undercover officer, the general closure was justified by the same showing of danger to the officer that made the closure acceptable with regard to Mrs. Sevencan. If there exists a basis to find the heightened, specific risk necessary to exclude a family member, there clearly exists a basis to close the courtroom to members of the public not linked to the defendant by the bonds of family or friendship.

## Other Claims

■ Mr. Sevencan's four claims about issues unrelated to the closure of the courtroom provide no basis for relief. The claim regarding improper ex parte communications between the trial judge and the prosecutor and the claim regarding the admission of a photocopy into evidence are procedurally barred. Both claims were raised on direct appeal before the Appellate Division, but neither was raised before the Court of Appeals. If a claim has not been brought to the attention of the highest court of a state, it cannot be considered on federal habeas review. *See* 28 U.S.C. § 2254(b)(1)(A). Because no state forum remains available in which Mr. Sevencan can raise these claims, and because the petitioner has shown neither cause for his failure to raise them to the Court of Appeals nor any resulting prejudice, they are procedurally barred. *See, e.g., See Gray v. Netherland,* 518 U.S. 152, 162, 116 S.Ct. 2074, 2080–81, 135 L.Ed.2d 457 (1996); *Coleman v. Thompson,* 501 U.S. 722, 750, 111 S.Ct. 2546, 2565, 115 L.Ed.2d 640 (1991).

Next, Mr. Sevencan argues that he was deprived of his right to an effective summation when the trial judge prohibited his counsel from arguing to the jury that a confidential informant named Kayahan was a co-conspirator. According to the petitioner, this argument was essential to Mr. Sevencan's defense of duress. As an initial matter, the respondent asserts that this claim is procedurally barred since the petitioner failed to object to the ruling at trial. Because the Appellate Division did not rely explicitly on this procedural default, however, and stated only that this and other unenumerated contentions were "either unpreserved for appellate review or without merit," this court should not assume a procedural bar and should instead look at the substance of the claim. When such review is conducted, it becomes apparent that the claim lacks merit. The trial record contains no evidence indicating that the confidential informant was in fact a co-conspirator, thus rendering the argu

ment baseless and irrelevant to a duress defense. It is therefore impossible to conclude that Judge Rappaport abused his "broad discretion" to restrict closing arguments that "stray unduly from the mark." *Herring v. New York*, 422 U.S. 853, 862, 95 S.Ct. 2550, 2555, 45 L.Ed.2d 593 (1975).

 Mr. Sevencan's final contention is that the trial court violated his rights by failing to disclose the identity and location of Kayahan, the confidential informant. According to the petitioner, this information was necessary to allow him to prepare his defense of duress. Although it is true that the disclosure of the name and address of a confidential informant may be constitutionally required when nondisclosure would deprive a defendant of his right to a fair trial, *see Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), disclosure is generally not necessary unless the informant's testimony is material to the defense. *See United States v. Saa*, 859 F.2d 1067, 1073 (2d Cir.1988). Materiality depends on such factors as "the crime charged, the possible defenses, [and] the possible significance of the informer's testimony," *Roviaro*, 353 U.S. at 62, 77 S.Ct. at 629, as well as whether the informant "is a key witness or participant in the crime charged, someone whose testimony would be significant in determining guilt or innocence." *United States v. Russotti*, 746 F.2d 945, 950 (2d Cir.1984). Even if the informant was a participant or witness, disclosure is not required if the defendant cannot establish that the informant's testimony "would have been of even marginal value to the defendant's case." *Saa*, 859 F.2d at 1073 (quoting *United States v. Jimenez*, 789 F.2d 167, 170 (2d Cir.1986)). Mr. Sevencan has made no showing that the confidential informant would have been of any value to his defense. As the Appellate Division observed, the informant's only role in the case was introducing Undercover 4126 to Mr. Sevencan, and there appears to be no support for the hypothesis that the informant knew about threats made against the petitioner. Without any showing of a need for disclosure of the informant's identity, Mr. Sevencan is not entitled to relief.

## Conclusion

For the reasons stated above, the petition for a writ of habeas corpus is denied. Because, however, the outcome of the court's analysis regarding the exclusion of the petitioner's wife from the courtroom is "debatable among jurists of reason," *Nelson v. Walker*, 121 F.3d 828, 832 (2d Cir. 1997) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n. 4, 103 S.Ct. 3383, 3393, 77 L.Ed.2d 1090 (1983)), the petitioner has made a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Mr. Sevencan is therefore granted a certificate of appealability as to that issue.

The Clerk of Court is directed to enter judgment accordingly.

SO ORDERED.